Argued and submitted September 18, 1986, reversed May 6, 1987

In the Matter of Anthony Billingsley,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

ANTHONY BILLINGSLEY,
*Appellant.*

(8602-95.0308; CA A39399)

736 P2d 611

Jan Peter Londahl, Portland, filed the brief for appellant.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Joseph, Chief Judge, and Newman and Deits, Judges.

DEITS, J.

**DEITS, J.**

Appellant appeals his involuntary commitment ordered pursuant to ORS 426.130. We review *de novo* and reverse.

Appellant was 18 years old at the time of the commitment hearing. His early family life was unstable. He had an alcoholic mother and several stepfathers. He attended high school until his junior year, when he joined the army. He is a member of the Army National Guard and was scheduled to begin vocational training shortly after the hearing in March, 1986. At the time of the hearing he had an apartment but was mainly living a street life. He had been working as a lookout at a "drug house," where he had become acquainted with FBI agents who paid him small amounts for information.

Appellant had not been in a psychiatric hospital nor had he seen a psychiatrist. On February 22, 1986, he telephoned 911 and reported that he was "wigging out." He said that he wanted to get away from the drug scene, have a place to stay for a few days and relax. A police officer took appellant to a hospital, where he tried to "freak out" so that he could stay. He punched a towel rack.[1] He testified that he had tried to convince the officer and court investigator that he was ill so that he could stay. He stated that he would not mind staying in the hospital until school started so that he could avoid drug activities, but he did have friends with whom he could stay and expected to receive $200 shortly. He testified that, if he had known that he might be committed, he would have been on the street, living his street life and going about his business until starting school.

Appellant was examined by two doctors. After examination, Dr. Bennett was "ambivalent" as to whether appellant was mentally ill and could not say whether he would harm himself or others or be able to care for himself. Dr. Goocher was "a little bit more persuaded" that appellant was experiencing a mental disorder which left him unable to provide for himself. The trial judge concluded that he was on the "verge of an explosion," showed poor judgment and was out of

---

[1] The only other evidence of any violence on the part of appellant was his involvement in a street fight about a day before he committed himself to the hospital and a fight while he was in the military.

touch with reality.

█  Before a court can make a mental commitment, there must be clear and convincing evidence that the person is mentally ill. ORS 426.130. A mentally ill person is one who, because of a mental disorder is either dangerous to himself or others or unable to provide for his basic personal needs. ORS 426.005(2). However, a finding either of dangerousness or inability to care for one's personal needs without a finding of mental disorder is insufficient to justify mental commitment. *State v. Smith,* 71 Or App 205, 692 P2d 120 (1984); *State v. Jepson,* 48 Or App 411, 617 P2d 284 (1980).

Appellant argues that, although the existence of a mental disorder is left for psychiatrists and trial courts to discern on an *ad hoc* basis, under no reasonable meaning of the phrase can the evidence here support the conclusion that he has or is subject to a mental disorder.

██  Appellant's decision to try to get a little rest and relaxation by claiming to be mentally unbalanced in order to get into a hospital may not show the best judgment; but poor judgment alone does not prove a mental disorder.[2] Although his speech patterns were frenetic, his answers to questions were not disoriented.[3] He logically interpreted the proverbs used by Bennett to test his ability to make abstractions. His testimony about his contacts with FBI agents is not implausible in the context of his street life and his acting as a watchman for a drug house. Appellant gave the names of the agents. He did not claim large payments or a central role in a large drug-bust operation. The account does not demonstrate delusions of grandeur. Neither physician stated the nature of the

---

[2] Appellant's testimony shows abysmal ignorance of the possible consequences of the decision.

[3] For example, appellant testified as to what he would do if discharged:

"I'm going to stay with a friend of mine. I got several places I can stay. But first thing I'm going to do is go out to my unit, get my military clothing gathered together and such and such. And then I'm going to check on my check, too, when I go out, make sure it didn't come in early. Then I'm going to go out to a friend of mine, John, you know, stay there for awhile. Munch out. He's a Bible student. I met him at Christian Church. I think it was some kind of meeting there. Anyways, I got several places I can stay, you know. I have lots of friends. I just didn't't, you know, I don't like to impose on my friends, you know. I mean, they got wives and, you know, children and such and such, you know. It's not polite to go there and stay with them, you know. $200 or not, you know. Even if I am taken out of school and I have no place to stay."

mental disorder from which appellant was allegedly suffering. *See State v. Alexander, supra,* 26 Or App at 948. We hold that the evidence does not prove that he was suffering from a mental disorder. Therefore, we cannot conclude that he is mentally ill.[4]

Reversed.

---

[4] Because of our resolution, we need not address his remaining two assignments of error.