STATE of Utah, Plaintiff and Appellee,

v.

Travis E. TELFORD, Defendant and Appellant.

No. 950560–CA.

Court of Appeals of Utah.

June 26, 1997.

Michael D. Bouwhuis, Ogden, for Appellant.

Jan Graham, Atty. Gen., and Barnard N. Madsen, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before WILKINS, Associate P.J., and BENCH and ORME, JJ.

BENCH, Judge:

Defendant Travis Telford was convicted of murder, a first-degree felony under Utah Code Ann. § 76–5–203 (1995). He appeals his conviction, arguing that the trial court erred when it denied his motion to suppress certain letters he wrote in jail. He also argues that the trial court erroneously denied his motion to sever the trial. We affirm.

## BACKGROUND

On March 12, 1994, the body of Troy Weston was discovered in a ditch near Willard Bay. Several days later, the police arrested defendant and charged him with Weston's murder. Brandon Dahlquist, the codefendant in this case, was also arrested and charged with the murder.

While defendant was incarcerated on the murder charge, he wrote several letters about the murder. After inspecting the letters pursuant to jail policy, jail officials made copies of some of the letters and sent the copies to the county attorney. Before trial, defendant filed a motion to suppress the letters, arguing that, by inspecting and copying the letters, jail officials had violated his First and Fourth Amendment rights. The trial court denied the motion, and, at trial, excerpts from three of defendant's letters were read to the jury.

Soon after defendant's arrest, Detective David Hansen escorted defendant to a police station in another city to question him about an unrelated matter. On the way back to the jail, defendant began talking to the detective about Weston's murder. The detective's report of defendant's statement is set forth, in relevant part, below:

Travis[,] without being asked[,] just started talking about the homicide of Troy Weston. He said that Troy had inquired about buying a gun from [codefendant] Brandon because he had some people that wanted to hurt him. So he said that he and Brandon went and picked up Troy Weston at his house and headed out to Willard to show him the gun.

He said that when he, Brandon Dahlquist, and Troy arrived out in Willard, Brandon pulled out a small automatic .22 cal. handgun. He said that they had parked on the side of the road to shoot. They then got out and went over to shoot the gun and Troy asked how did it work.

Travis said that when Troy asked if it worked, Brandon then said, "I'll show you how it works." He then said that Brandon then pointed the gun at Troy and shot him in the shoulder. He said Troy screamed and said what are you doing? He then said Brandon then shot him again, this time twice in the back because Troy then had shifted sideways. He then said that Troy continued to yell for him to stop it. He then said one of the bullets must have hit Troy's spine because he quit moving and just dropped to the ground. Brandon then shot him again twice more in the front and the gun jammed. Brandon then told Travis to go to the Blazer and get another clip so Travis ran to the Blazer and got another clip.

He then said when he got back from the Blazer, Brandon loaded the new clip and placed the gun under Troy's chin and pulled the trigger one last time. He then said Troy did not move anymore and Brandon told him to drag the body about 30

feet to a ditch. He then said they got back in the Blazer and sped back to Ogden.

Over the objections of both defendants, the trial court allowed Detective Hansen to read a redacted version of defendant's statement to the jury. To protect codefendant's confrontation rights, the trial court had ordered that the statement be redacted to omit any reference to Dahlquist.[1] Defendant had argued that admission of the redacted statement would force him to testify, in violation of his Fifth Amendment rights, because it falsely implied that he had pulled the trigger. Although the redacted statement was admitted into evidence, defendant never testified.

Defendant also argued that, under his Sixth Amendment right to confront witnesses, he should be permitted to ask Detective Hansen on cross-examination whether the statement, as read to the jury, was a complete representation of what defendant had told him. Defendant contended that the redacted portions of his statement are exculpatory and that further cross-examination of the detective might reveal additional exculpatory evidence. The trial court did not allow defendant to ask Detective Hansen about any redacted matters or to refer to codefendant in any way.

During a pretrial hearing, and again at trial, defendant requested that he and codefendant be tried separately. The trial court,

however, refused to sever the trial. The jury convicted both defendants of murder.[2]

■ On appeal, defendant argues that jail officials violated his First and Fourth Amendment rights by inspecting and copying the letters he wrote in jail. He therefore contends that the trial court erroneously denied his motion to suppress the letters. He also argues that the trial court erroneously denied his motion to sever the trial and that he was prejudiced by the trial court's refusal to sever. As evidence of prejudice, he argues that the trial court violated his Sixth Amendment rights by precluding him from fully cross-examining Detective Hansen.[3]

Defendant cites analogous provisions of the Utah Constitution to support his arguments. He fails, however, to explain how the Utah Constitution should be interpreted differently from the Federal Constitution. We therefore limit our analysis to the Federal Constitution. *See State v. Wood,* 868 P.2d 70, 90 n. 4 (Utah 1993).

## ANALYSIS

### I. Admissibility of Letters

■ Defendant argues that, because jail officials violated his Fourth Amendment rights when they inspected and copied his outgoing, nonprivileged letters, the trial

---

1. The redacted statement, as read to the jury, appears in the transcript, in relevant part, as follows:

   Travis, without being asked, started to talk about the homicide of Troy Weston. He said that Troy had inquired about buying a gun because he had some people who wanted to hurt him. He said he went and picked up Troy Weston at his house and headed out to Willard to show him the gun.

   He said that when he and Troy arrived out in Willard out came a small automatic .22 caliber handgun. He said that they had parked on the side of the road to shoot. They then got out and went over to shoot the gun and Troy asked how did it work. Travis said that when Troy asked if it worked, he was shot in the shoulder. He said Troy screamed and said what are you doing. Troy then was shot again. This time twice in the back, because Troy's body had then shifted sideways.

   He then said Troy continued to yell to stop it. He then said that one of the bullets must have hit Troy's spine because he quit moving and just dropped to the ground. Troy was then

shot again twice more in the front and the gun jammed. He said it either jammed or ran out of ammunition. Travis went back to the Blazer and got another clip. When he got back to the Blazer the new clip was loaded and the gun was placed under Troy's chin and the trigger pulled one last time. He then said Troy did not move any more and he dragged the body about 30 feet to the ditch. He then got back to the Blazer and sped back to Ogden. (Quotation marks omitted.)

2. This court reversed codefendant's conviction on the ground that his *Miranda* rights were violated during police interrogation. *See State v. Dahlquist,* 931 P.2d 862, 868 (Utah.Ct.App.1997).

3. Defendant also contends that the trial court violated his Fifth Amendment right against self-incrimination. We decline to address defendant's Fifth Amendment argument, however, because he has failed to cite any authority to support his contentions. *See State v. Bishop,* 753 P.2d 439, 450 (Utah 1988).

court erroneously denied his motion to suppress the letters. He further argues that jail officials violated his First Amendment rights by their actions. We review the trial court's legal conclusions underlying its decision to deny the motion to suppress under a correction-of-error standard. *See State v. McGrath,* 928 P.2d 1033, 1036 (Utah.Ct.App. 1996).

In *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), the United States Supreme Court held that the defendant's Fourth Amendment rights were not violated by the seizure and prosecution's use of letters the defendant had written in jail. *See id.* at 21–22, 40 S.Ct. at 52–53; *see also Hudson v. Palmer,* 468 U.S. 517, 536, 104 S.Ct. 3194, 3205, 82 L.Ed.2d 393 (1984) ("[T]he Fourth Amendment has no applicability to a prison cell."). The Supreme Court emphasized that the officials were following the established policy of the prison when they inspected the letters. *See Stroud,* 251 U.S. at 21, 40 S.Ct. at 52–53. Later, the Supreme Court held that, under the First Amendment, prison regulations restricting correspondence "must further an important or substantial government interest" and be no greater than is necessary to protect the interest. *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989). Since *Martinez,* courts have limited *Stroud's* Fourth Amendment holding to cases in which prison officials have seized and inspected outgoing, nonprivileged letters "in the exercise of legitimate government interests." *United States v. Whalen,* 940 F.2d 1027, 1035 (7th Cir.1991) (citing cases limiting *Stroud*).

■ Here, the jail policy governing outgoing mail provides that mail will be "inspected and scanned" before delivery outside the jail. Defendant concedes that he was on notice of this policy. We conclude that the policy is narrowly tailored and serves important government interests by promoting discipline and preventing criminal acts. *See People v. Whalin,* 885 P.2d 293, 296 (Colo.Ct.App. 1994); *see also Whalen,* 940 F.2d at 1035 ("[I]t is well established that prisons have

sound reasons for reading the outgoing mail of their inmates."). In addition, "[o]nce prison officials have a right to examine such messages, no rule requires them to close their eyes to what they discover therein." *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105, 1115 (1983). Therefore, because jail officials did not violate defendant's Fourth Amendment rights by inspecting and copying his nonprivileged, outgoing mail, the trial court properly denied defendant's motion to suppress the letters.

■ Turning to defendant's First Amendment argument, we note that "jail personnel did not deprive defendant of his correspondence through censorship or refusal to forward any letters." *Whalin,* 885 P.2d at 296. Because the letters were only inspected and copied, jail officials did not violate defendant's First Amendment rights. *See id.*

## II. Severance of Trial

Defendant contends that the trial court erroneously denied his motion to sever the trial. He argues that his defense, which emphasized that codefendant had pulled the trigger and forced defendant to obtain more ammunition, was irreconcilable with the arguments of codefendant, who raised an alibi defense. Defendant further argues that he was prejudiced by the trial court's denial of his motion to sever.

■ The Utah Code provides that when a defendant is prejudiced by joinder of trials, "the court shall ... grant a severance of defendants, or provide other relief as justice requires." Utah Code Ann. § 77–8a–1(4)(a) (1995). In interpreting this provision, the Utah Supreme Court has held that "[d]oubts concerning prejudice should be resolved by the trial court in favor of a defendant." *State v. Collins,* 612 P.2d 775, 777 (Utah 1980). The supreme court has further stated that, although trial courts "appear to be reluctant to grant severance," that reluctance "is ill-advised and in the long run risks greater expenditure of judicial resources." *State v. O'Brien,* 721 P.2d 896, 898 (Utah 1986). Thus, if "joint defendants have defenses that appear to be inconsistent with or to obstruct or impede each other," trial courts must

"carefully examine" severance requests and "grant severance when there is any doubt as to prejudice." *Id.*

■ Defendant argues that his defense was antagonistic and irreconcilable with that of codefendant. "Antagonistic defenses alone are not sufficient to require a separate trial." *State v. Velarde,* 734 P.2d 440, 445 (Utah 1986). Rather, severance is required only if "the defenses conflict to the point of being irreconcilable and mutually exclusive." *Id.* At trial, defendant argued that codefendant shot Weston and ordered defendant to retrieve additional ammunition from the Blazer. Codefendant, however, denied that he was at the scene when the shooting occurred. Thus, the defenses were mutually exclusive: the jury had to reject one defense to believe the other. *See Silva v. State,* 933 S.W.2d 715, 719 (Tex.App.1996). Under these circumstances, we agree with defendant that the trial court erred in refusing to sever the trial.

■ Despite the error, however, we will reverse only if a more favorable result for defendant would have been reasonably likely had the trial court severed the trial. *See State v. Ellis,* 748 P.2d 188, 190 (Utah 1987). As evidence of prejudice, defendant asserts that he was precluded from fully cross-examining Detective Hansen, in violation of the Sixth Amendment. *See id.* at 189–90 (addressing merits of argument that refusal to sever resulted in Sixth Amendment error); *see also Herd v. Kincheloe,* 800 F.2d 1526, 1529 (9th Cir.1986) (stating that denial of severance may result in violation of confrontation rights).

■ In particular, defendant contends that, had the trial court severed the trial, his entire statement identifying codefendant as the shooter would have been admissible through cross-examination of Detective Hansen. We have reviewed the unredacted statement, however, and conclude that although the statement clearly implicates codefendant as the shooter, it also portrays defendant himself as an active participant in the murder.[4] In contrast, the unredacted statement contains no exculpatory evidence that might reasonably have led the jury to either acquit defendant or find him guilty of a lesser included offense. Therefore, we conclude that any constitutional error in excluding the redacted portions was harmless. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (concluding that confrontation clause error is subject to harmless-beyond-a-reasonable-doubt standard).

■ Defendant further argues that, if tried separately, he would have been allowed to cross-examine Detective Hansen about other exculpatory statements.[5] The Utah Supreme Court has stated that "we will not set aside a verdict because of the erroneous exclusion of evidence unless a proffer of evidence appears of record." *State v. Rammel,* 721 P.2d 498, 499 (Utah 1986); *see also* Utah R. Evid. 103(a)(2). Here, the record does not reflect that defendant informed the trial court that further cross-examination of Detective Hansen might reveal other exculpatory statements given by defendant. Therefore, the "substance" of this particular evidence was not "made known to the court," nor was it "apparent from the con-

---

4. The trial court commented on the unredacted statement as follows:

> [I]f the statement came in with no redactions, it is in essence a confession anyway. If the jury finds, as a matter of fact, that defendant Telford went to the vehicle, got more ammunition, brought the clip back so that the shooting, or execution at that point, could be completed, then he has in effect confessed to being part and parcel of that crime.

Defendant's counsel agreed with this characterization, but argued that the jury might instead use the unredacted statement to convict defendant of a lesser included offense.

5. In support of this contention, defendant points to the comments of counsel for codefendant at a preliminary hearing:

> I figure we have 14 statements that this defendant [Telford] has made. The first one goes from I wasn't there, but I think Brandon did it, all the way to that Brandon pulled the trigger and pointed the gun at me and made me drag the body. He pointed the gun at me and made me load it again so we could pump more bullets into the body....
> ....
> It is clear Mr. Telford is saying you made me do it and you pointed a gun at me. That's what Mr. Telford's defense will be.

text within which questions were asked." Utah R. Evid. 103(a)(2); *see State v. Arguelles,* 921 P.2d 439, 445 (Utah 1996) (requiring offer of proof to show what evidence would be adduced). We therefore do not address the merits of defendant's argument. *See Arguelles,* 921 P.2d at 445.

## CONCLUSION

The trial court properly denied defendant's motion to suppress the letters he wrote in jail. Although the trial court erred in refusing to sever the trial, that error, as well as any resulting constitutional error, was harmless. We therefore cannot say that, had the trial court severed the trial, defendant would have been reasonably likely to obtain a more favorable result.

Defendant's conviction is affirmed.

WILKINS, Associate P.J., and ORME, J., concur.