2002 UT 87

**STATE of Utah, Plaintiff and Appellant,**

v.

**Jordan CALLIHAM, Defendant and Appellee.**

No. 20000209.

Supreme Court of Utah.

Aug. 16, 2002.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Salt Lake City, Craig C. Halls, San Juan County, for plaintiff.

Happy Morgan, Moab, for defendant.

DURHAM, Chief Justice:

¶ 1 Two brothers, Jordan and Terril Calliham (collectively, "the Calliham brothers"), were convicted of murder for the killing of their friend and classmate James Eaton ("Eaton"). Jordan Calliham ("Jordan") appeals,[1] claiming that the trial court erred in denying his request for a psychological evaluation of the State's primary witness and in refusing to sever his trial from that of his brother. Jordan also claims the trial court abused its discretion by admitting into evidence photographs of the crime scene. We affirm Jordan's conviction.

## BACKGROUND

¶ 2 The background of the crime and procedural history are described in detail in our ruling concerning the appeal of Jordan's brother, Terril Calliham ("Terril"). *State v. Calliham*, 2002 UT 86, ¶¶ 2–18, 454 Utah Adv. Rep. 25, 55 P.3d 573. We therefore give only an abbreviated description here.

### I. BACKGROUND OF THE CRIME

¶ 3 On April 9, 1999, the body of Eaton was found just off of Ucolo Road, approxi-

---

1. Terril Calliham also appeals his conviction, which we address in a separate opinion. *See* *State v. Calliham*, 2002 UT 86, 454 Utah Adv. Rep. 25, 55 P.3d 573.

mately a mile inside the Utah border. Eaton had been shot at least 19 times. Following a criminal investigation, the Calliham brothers were arrested and charged with murder.

¶ 4 At trial, the State offered evidence suggesting the following fact scenario. Eaton and Jordan were best friends; however, Jordan suspected that Eaton had stolen some drugs from him. On the evening of April 3, 1999, Eaton joined Misty Ernst ("Ernst"), who was Jordan's girlfriend, and the Calliham brothers on a drive to a nearby town where they planned to purchase illegal drugs. While driving, Eaton suggested they smoke a joint of marijuana. Jordan whispered to Ernst to not let them smoke in the car.[2] Ernst complied, and Eaton suggested they turn onto Ucolo Road. After parking, Ernst stayed at the car, while the three men went beyond a grove of trees to smoke the joint. Ernst at first heard them laughing; then she heard a gun shot, followed by a volley of fifteen or more shots. During the shots, Ernst heard Eaton crying and asking, "Why did you kill me?" After a brief pause, Ernst heard a final shot. When the Calliham brothers came running back to the car, Ernst asked if Eaton was dead. Jordan stated he had "finished James off in the head" and that he had fired the final shot after clearing a gun jam. He also explained how Eaton had tried to shield himself from the bullets with his hands. Terril stated that Eaton did not immediately fall when he shot him and that he had thought he may have to kick Eaton over.

¶ 5 After the murder, the Calliham brothers split up, apparently in an effort to establish an alibi for each of them. Terril was dropped off in Dove Creek, while Jordan and Ernst drove to Cortez. Just after dropping off Terril, Jordan called Terril on his cell phone to make it look as though Jordan was already in Cortez. After arriving in Cortez, Jordan spoke with a friend, Michael Gentry ("Gentry"), while Ernst waited in the car. Asked how things were going, Jordan told Gentry he had "solved his problems" and gestured as though he was pulling the trig-

ger of a gun. Jordan asked Gentry to tell anyone who asked that Jordan had been there that night. When he returned to the car, Jordan told Ernst that he had told Gentry "what him [i.e., Jordan] and Terril had done."

¶ 6 That evening, Jordan showed Ernst the blood-spattered guns he and Terril had used in the shooting. Later, while in jail awaiting trial, Jordan admitted to other prisoners that he had been involved in the killing, showed them how he had held his gun, and imitated the way Eaton's body vibrated as it was impacted by bullets.

¶ 7 At trial, Jordan and Terril offered evidence to suggest that Ernst, the State's primary witness, had made inconsistent statements about the killing and had a reputation in the community for being dishonest. In addition, they offered evidence to suggest that someone other than the Calliham brothers had a motive to kill Eaton and had threatened to kill Eaton.

¶ 8 At the close of a three-day trial, the jury found both Jordan and Terril guilty of criminal homicide.

## II. PROCEDURAL HISTORY

¶ 9 The Calliham brothers were charged with criminal homicide, a first-degree felony, under Utah Code Ann. § 76-5-203 (2001). After a preliminary hearing, they were bound over for trial.

¶ 10 Before trial, Jordan moved to require Ernst to submit to a psychological evaluation, and Terril joined in the motion. They argued that Ernst's testimony at the preliminary hearing suggested that she experienced hallucinations, had difficulty distinguishing dreams from reality, and manifested a propensity to lie. Ernst opposed the motion, stating that she had no history of mental illness and that any incongruities in her testimony at the hearing were due to normal emotional turmoil. The court denied the motion for an evaluation. It held that there was no evidence that Ernst had suffered from mental illness in the past and that the hear-

**2.** Ernst testified that she found this request unusual since they usually smoked in the car. She stated that, at the time, the request made her suspect that Jordan planned to beat up Eaton when they pulled over.

ing transcript gave no indication that she was unable to differentiate dreams from reality or to testify truthfully. The court stated that "absent evidence of actual mental illness, the court will not order an examination to fish for it."

¶ 11 Jordan also moved to exclude from evidence crime scene and autopsy photographs of the victim. He argued that the photos were gruesome, would unfairly prejudice the jury, and were of no probative value because the manner in which the victim died was not disputed. The State argued that the photographs were essential to bolster its witnesses' testimony about how the crime occurred. The court denied the motion with regard to the crime scene photographs but granted it with respect to all but two autopsy photos. It held that the crime scene photographs were not gruesome and that the two autopsy photographs were relevant to showing that the final wound was inflicted at close range.

¶ 12 Prior to trial, the Calliham brothers anticipated that the State planned to introduce the testimony of persons who had been in jail with Jordan. These informants were expected to testify of inculpatory statements made by Jordan while in jail. Upon finding that the State planned to use this testimony, Terril made a renewed motion for severance,[3] claiming that admission of Jordan's statements would prejudice Terril.

¶ 13 In an off-the-record conference before trial, the parties discussed the admission of this testimony. The court determined that because Jordan was not going to testify, use of Jordan's statements against Terril would violate Terril's constitutional right to confront the witnesses against him. The court ruled that the witnesses could testify of the statements made by Jordan, but that the testimony must be limited so that it would not implicate Terril. The witnesses would be instructed that, when relating Jordan's admissions, the witnesses must replace the pronoun "we" with "I." Also, to ensure that the witnesses did not inadvertently implicate

Terril, the court instructed counsel to lead the witnesses. Further, the court instructed Jordan's counsel that she could not cross-examine in a way that might elicit from the witnesses that Jordan had said there was another person with him at the time of the killing.

¶ 14 The court later reiterated its ruling on the record. Jordan objected to the redaction of the admissions, arguing that the redaction prevented him from arguing that he was merely a passive observer when the killing took place. Jordan also objected to the court's decision to allow the State to use leading questions and to the limits the court imposed on the scope of cross examination. The court overruled the objections, holding that the redaction was in no way prejudicial since the statements in their original form did not suggest that Jordan had merely been an observer.

¶ 15 Later in the trial, the State called a number of witnesses who had been in jail with Jordan. These informants testified of statements made by Jordan wherein he admitted to being involved in the killing. The State was allowed to lead each witness so that Terril would not be implicated by the admissions. The jury was instructed that the testimony of the informants could only be considered in assessing Jordan's guilt or innocence and could not be used against Terril.

¶ 16 After twelve hours of deliberations, the jury found Jordan guilty of the charged offense. Jordan timely appealed, claiming the trial court erred in denying his motion for a psychological evaluation of Ernst, in failing to sever the trials, and in admitting into evidence crime scene photographs.

## ANALYSIS

### I. MOTION FOR A PSYCHOLOGICAL EVALUATION

■ ¶ 17 Before trial, Jordan moved for a psychological evaluation of the State's primary witness, Ernst. The State took no position on the motion; and Ernst submitted

---

**3.** Earlier in the proceedings, Terril had moved to sever and the court had denied the motion, stating that its ruling could be reconsidered if the prosecution decided to use a statement of either defendant at trial. Jordan did not join in Terril's original motion to sever and there is no record of him joining in the renewed motion.

a memorandum in opposition to the motion. In his motion for the evaluation, Jordan claimed that there was "great doubt" about Ernst's ability to perceive, remember, and communicate facts accurately. He stated that at the preliminary hearing Ernst "admitted to having difficulty distinguishing between what was real and what was a dream," that she "stated that she hallucinates," that she "went from uncontrollably crying to giggling and joking in a few short minutes," that she "admitted to using illegal drugs" including "marijuana, a known hallucinogen," and that she admitted to "being untruthful to her parents."

¶ 18 After reviewing the preliminary hearing transcript, the trial court denied the motion. The trial court found the following:

> [T]he only hint of mental illness is the adoption by the witness of defense counsel's characterization of her dreams as "hallucinations." There is no evidence of mental illness preceding the crime. The transcript does not suggest to the court that [Ernst] suffers from mental illness. To the contrary, [Ernst] appears capable of distinguishing between what happened, what she dreamed, what she worried about, what she told officers on different occasions, what she wanted to say, what she heard from others, and what Jordan and his brother might want her to say. If the court were to order a psychiatric examination based on [Ernst's] preliminary hearing testimony, an examination would be required in virtually all cases.

### A. Standard of Review

¶ 19 We have long held that the determination whether to order a psychological examination rests largely within the discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *See State v. Lairby*, 699 P.2d 1187, 1197 (Utah 1984), *State v. Hubbard*, 601 P.2d 929, 930 (Utah 1979); *Stone v. Stone*, 19 Utah 2d 378, 431 P.2d 802, 803 (1967); *State v. Braun*, 787 P.2d 1336, 1343 (Utah Ct.App.1990); *see also State v. Scott*, 22 Utah 2d 27, 30, 447 P.2d 908, 911 (1968) (trial court's determination of competency reviewed for abuse of discretion); *State v. Snowden*, 23 Utah 318, 327, 65

P. 479, 481 (1901) (same). Notwithstanding this precedent, Jordan argues that this court should review this issue for correctness. He says that in this case there is no cause to give deference to the trial court because the trial judge based his ruling on the preliminary trial transcript, which is readily available to this court. The trial court, he argues, was in no more an advantaged position to determine the need for an evaluation than we are.

¶ 20 We review most evidentiary rulings and questions of fact with deference to the trial court based on the presumption that the trial judge, having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record. *See State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994). We decline to depart from this tradition in this case. While it is true that the trial court based its ruling primarily upon the preliminary trial transcript, it was not bound to the transcript as we are. Had the court found the transcript inconclusive, it could have held an evidentiary hearing to gather more information on the mental state of the witness. Further, the trial court had the benefit of viewing the parties and the witnesses throughout the course of the trial. If during the trial the court had seen evidence of the witness's incompetence, it could have responded to a renewed motion for an evaluation. The fact that this did not happen does not mean the trial court's perspective was of no enhanced value; it merely means the court saw no cause to formally expand the inquiry into Ernst's mental state.

¶ 21 We therefore review the trial court's ruling for an abuse of discretion. We will reverse only if we find, based on the preliminary trial transcript, that the court's factual findings were against the great weight of the evidence. *Id.* We review for correctness whether the trial court applied the appropriate rule of law. *Id.* at 936.

### B. Application

¶ 22 A trial court's power to order an individual to submit to a psychological evalu-

ation derives from its discretion to qualify a witness as competent. *See State v. R.W.*, 104 N.J. 14, 514 A.2d 1287, 1290 (N.J.1986). Utah law imposes a very low bar for establishing the competency of a witness. Under section 78–24–1 of the Utah Code, "[a]ll persons, without exception, otherwise than as specified in this chapter, who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses." Utah Code Ann. § 78–24–1 (2001). Similarly, rule 601 of the Utah Rules of Evidence provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." Utah R. Evid. 601. The language of this rule "was meant to abolish age, mental capacity, and other grounds which used to render a person incompetent as a witness." *State v. Fulton,* 742 P.2d 1208, 1217 (Utah 1987); *see also State v. Eldredge,* 773 P.2d 29, 33 (Utah 1989) (holding that rule 602 "merely requires that the witness have the opportunity and the capacity to perceive the events in question").

¶ 23 Once a witness is deemed competent, matters of credibility are best left to the jury. "[I]n our judicial system it is the role of juries to decide how much weight to give the testimony of particular witnesses, not the role of independent experts." *State v. Hubbard,* 2002 UT 45, ¶ 15, 46 Utah Adv. Rep. 33, 48 P.3d 953, ¶ 15 (2002).

¶ 24 Given the low threshold for competency and the preference for leaving matters of credibility to the judgment of the jury, we have articulated a standard that will require a witness to submit to a psychological evaluation only when there are legitimate doubts about the witness's ability to testify accurately and truthfully and those doubts cannot adequately be investigated through cross examination. *See, e.g., Lairby,* 699 P.2d at 1197; *see also United States v. Brown,* 770 F.2d 768, 770 (9th Cir.1985) (holding that trial court did not abuse discre-

tion in denying motion for psychological examination where witnesses were extensively cross-examined concerning their drug use and mental problems). Thus, the court may order a witness to submit to a psychological examination if "there is substantial doubt that a witness is capable of understanding and appreciating the duty to tell the truth, or that he is able to perceive, remember, and communicate facts with reasonable accuracy."[4] *State v. Hubbard,* 601 P.2d 929, 930 (Utah 1979). In order to show substantial doubt, "the party requesting the testing must present evidence reasonably indicating something peculiar, unique, or abnormal about the ... witness that would influence the witness's competence or the court's ability to assess that competence, or raise unusual difficulties in assessing the witness's credibility." *R.W.,* 514 A.2d at 1291. Because mandating a psychological evaluation can potentially invade the privacy of the witness and discourage other witnesses from coming forward, such a motion should not be granted lightly. *See Stone v. Stone,* 19 Utah 2d 378, 431 P.2d 802, 804 (1967) ("The question of a person's sanity nearly always involves considerable delicacy.... [T]he court would always be well advised in exercising caution and restraint in regard to such a request...."); *R.W.,* 514 A.2d at 1294 ("[T]he possible evidentiary benefits to a defendant flowing from such a court-ordered examination of the witness are outweighed by the resulting invasion of the witness's right to privacy and the danger to the public interest from discouraging victims of crime to report and assist in the prosecution of such offenses.").

¶ 25 Jordan claims that the trial judge inappropriately considered only whether Ernst had a past history of psychological problems. The standard set forth above requires the court to consider both the past and present mental state of the witness, insofar as these are relevant to the witness's ability to perceive and relate the events accu-

---

4. This standard does not apply where a psychological evaluation of a witness has already been performed and the prosecutor seeks to avoid turning the evaluation over to the defense. A prosecutor must turn over evidence if it is constitutionally material, that is, if the evaluation "may reasonably cast doubt on the ability or willingness of a witness to tell the truth." *State v. Bakalov,* 1999 UT 45, ¶¶ 31–32, 979 P.2d 799 (quoting *United States v. Smith,* 77 F.3d 511, 516 (D.C.Cir.1996)).

rately. *See, e.g., State v. Stewart,* 925 P.2d 598, 600 (Utah Ct.App.1996). We find it evident from the trial court's order denying the motion that it considered both Ernst's past and present mental state. In addition to finding no mental illness preceding the crime, the trial court specifically addressed Ernst's current ability to testify:

> The transcript does not suggest to the court that [Ernst] suffers from mental illness. To the contrary, [Ernst] appears capable of distinguishing between what happened, what she dreamed, what she worried about, what she told officers on different occasions, what she wanted to say, what she heard from others, and what Jordan and his brother might want her to say.

Clearly, the court was concerned with more than Ernst's past mental history.

¶ 26 Jordan also claims that the trial court's finding that Ernst was capable of testifying truthfully and accurately was against the great weight of the evidence.[5] First, he claims the trial court erred in failing to find that Ernst had "questionable mental health" prior to the crime. Based on Ernst's statements at the preliminary hearing, Jordan concludes that before the crime Ernst had a sexual relationship with a minor, used illegal drugs, and didn't take proper care of her child. He asserts that this gives ample cause to question her mental stability. However, Jordan fails to explain how these conclusions manifest a psychological disorder that places in substantial doubt Ernst's ability to accurately perceive the crime. "[P]oor judgement alone does not prove a mental disorder," *State v. Billingsley,* 85 Or.App. 387, 736 P.2d 611, 613 (1987), nor does past drug use establish incompetency, *see State v. Eaton,* 569 P.2d 1114, 1116–17 (Utah 1977); *State v. Jiron,* 26 Utah 2d 311, 489 P.2d 109, 110 (1971); *State v. Thomas,* 554 P.2d 225, 227 (Utah 1976); *see also Carter v. State,* 2000–KA–00758–5CT ¶ 43, 799 So.2d 40 (Miss.2001) (collecting cases). Without more, the trial court had no cause to assume that Ernst's perceptive abilities were in serious doubt.

¶ 27 Second, Jordan claims that the preliminary hearing transcript revealed that Ernst was unable to distinguish dreams and hallucinations from reality. Jordan points specifically to a brief portion of the transcript where Ernst makes vague reference to "hallucinations." [6] After admitting that some of what she told police was based on rumors, rather than what she perceived herself, Ernst stated that "a lot of it too was just what was in my head." She then stated that she had "seen" Eaton after the murder:

> Q: What kind of stuff did you see, Misty?
>
> A: I saw James. I mean, I saw James every night.
>
> Q: What do you mean when you say you saw him? You dreamt about it—
>
> A: Yeah.
>
> Q: —or he came back to see you?

5. Jordan elaborates upon several possible diagnoses for Ernst's alleged psychological problems. We find this approach unpersuasive. Merely because one has symptoms of a psychological disorder does not necessarily mean one cannot testify truthfully and accurately. *Stewart,* 925 P.2d at 600. It is not the place of the court to attempt to psychoanalyze witnesses. *See Stone v. Stone,* 19 Utah 2d 378, 431 P.2d 802, 807 (1967) (Ellett, J., dissenting) (stating that court should not grant or deny motion for evaluation based merely upon what it presumes the outcome of the evaluation will be). Rather, the court must consider only whether the witness's functioning is so in doubt that a psychological evaluation is necessary to evaluate her competency or to protect the jury from testimony that is wholly unreliable.

6. Jordan also points to Ernst's statement that she is good at deceiving people and various inconsistencies in Ernst's testimony. Viewing the record as a whole, however, we do not find that these create a substantial doubt as to Ernst's capacity. The fact that one considers oneself good at deceiving people does not make one incapable of understanding the duty to tell the truth. Further, while Ernst's inconsistent statements may "show[ ] the witness either became confused or lied while on the witness stand, [they] certainly [do] not clearly prove that the witness's testimony was affected by a mental disorder." *Stewart,* 925 P.2d at 601. Ernst was interviewed on several occasions and, through the course of the investigation, suffered mixed emotions about testifying against her former boyfriend Jordan. The incongruities in her testimony reflect her emotional turmoil and vacillating loyalty to the Calliham brothers; but they do not raise a substantial doubt about her ability to understand her oath or relate her perceptions accurately.

A: He came back to see me and was telling me—

Q: Do you recognize now that these things were hallucinations?

A: Yeah.

Q: When you had these hallucinations, you thought they were true?

A: Yes.

. . . .

Q: And when you ·talked to the police officers, did you tell them things that were part of your hallucinations?

A: Well, I was telling them my halluc— whatever—

Q: Hallucinations?

A: Yeah.

Ernst's testimony could be construed to suggest that she suffered from hallucinations. It seems more likely, however, given the context of the testimony, the fact that there are no other references to hallucinations in the transcript, and the way in which defense counsel led Ernst to adopt the term "hallucinations," that Ernst was merely referring to traumatic nightmares she had following the murder and, lacking a clear understanding of defense counsel's terminology, she conformed to the characterization of her dreams as hallucinations. Further, even if Ernst did at some point experience hallucinations, there was ample evidence in the remainder of the transcript for the trial court to conclude that she was competent. Ernst's testimony clearly indicates that at the time of the preliminary hearing she was capable of distinguishing what had actually happened from her dreams, from what others had told her, and from what she had said to· police officers in the past. Given the clarity Ernst manifests in the preliminary hearing transcript and the scant evidence drawing into question her mental state, we find that the trial court did not abuse its discretion in denying the motion for a psychological evaluation.

## II. MOTION TO SEVER THE TRIALS

¶ 28 Jordan claims the trial court erred in failing to sever his trial from that of his brother. Specifically, Jordan asserts that the limiting methods imposed by the trial court· prevented witnesses from testifying freely and accurately and thereby undermined the integrity of the trial. Further, Jordan claims that the limitations the trial court imposed upon his cross-examination of these witnesses violated his rights under the confrontation clause of the Sixth Amendment.[7]

¶ 29 The State argues that Jordan waived these claims by failing to join in Terril's motions for severance. Under Utah Code section 77–8a–1(4)(b), a defendant waives his right to severance if the motion is not made at least five days before trial. Utah Code Ann. § 77–8a–1(4)(b) (2001). In waiving severance, however, Jordan certainly did not waive all rights to object to the manner in which evidence was presented. Though not joining in Terril's motions, Jordan did timely object on the record to the limiting methods imposed by the trial court. We therefore address Jordan's claims only as objections to the redaction of Jordan's statements and the limits the trial court placed on the direct and cross-examination of the witnesses.

### A. Trial Integrity

¶ 30 In claiming that the limiting methods imposed by the trial court undermined the integrity of the trial, Jordan cites the same cases Terril cited in his appeal and gives an identical rationale. Having found Terril's claim without merit, State v. Calliham, 2002 UT 86, ¶ 38–39, 454 Utah Adv. Rep. 25, 55 P.3d 573 we need not repeat our analysis here. Even under a higher standard of scrutiny, we see no cause to assume that· redaction of Jordan's admissions and the use of leading questions prevented the witnesses from testifying freely and accurately or resulted in the knowing admission of false testimony. Jordan has not identified any "false testimony" offered at trial, see State v. Hewitt, 689 P.2d 22, 24 (Utah 1984), nor has he identified any exculpatory evidence that

---

7. Jordan also claims that his rights. under the confrontation clause of the Utah Constitution were violated. We do not address Jordan's state claim, however, since he has failed to separately brief it. See State v. Ellis, 748 P.2d 188, 190 (Utah 1987).

was withheld from the jury,[8] *see Walker v. State*, 624 P.2d 687, 688–91 (Utah 1981). We therefore find no merit to Jordan's claim that the limiting methods undermined the integrity of the trial.

## B. Confrontation Clause

¶ 31 Jordan next claims that the limits the court imposed upon cross-examination violated his rights under the Confrontation Clause of the United States Constitution. Whether testimony was admitted in violation of defendant's right to confrontation is a question of law. We review such questions for correctness. *See State v. Heaps*, 2000 UT 5, ¶ 12, 999 P.2d 565. "The right of cross-examination is 'one of the safeguards essential to a fair trial.'" *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (quoting *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931)). "Although we have repeatedly emphasized the importance of allowing a cross-examiner wide latitude in exposing a witness' potential bias, the right of cross-examination is not without limitation." *State v. Hackford*, 737 P.2d 200, 203 (Utah 1987) (citations omitted). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.... '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quot-

ing *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)).

¶ 32 In this case, the trial court prohibited Jordan's counsel from cross-examining in such a way that would suggest that Jordan's admissions also implicated Terril. The trial court did not prohibit Jordan's counsel from cross-examining the witnesses altogether, nor did it apply these limits to any witnesses other than those who recounted admissions Jordan made while in jail. Jordan's counsel was still free to—and, in fact, did—attack the credibility of these witnesses by inquiring into their criminal histories, their potential biases, and their motives and opportunities to fabricate. The only way in which Jordan might have been benefitted by a more extensive cross-examination is if the witnesses could have stated on cross that the confessions implicated Terril *rather than* Jordan. Indeed, Jordan's objection to the limits on cross was that it prevented him from claiming that he was a passive observer when Terril did the killing. The statements, however, even before redaction, did not indicate that Jordan was merely present when another did the killing.[9] Thus, there is nothing more that could have been evoked on cross to exculpate Jordan.[10] *See State v. Telford*, 940 P.2d 522, 525–26 (Utah Ct.App.1997) (finding failure to sever and limits on cross-examination harmless where both the redacted and unredacted forms of the admitted testimony portrayed the defendant as an active participant in murder). Had the admissions been offered without redaction, the testimony would have been just as damaging to Jordan

---

8. Since the statements did not imply that Jordan merely watched while another did the killing, admission of the redacted portions would not have benefitted Jordan. *See* note 9, *infra*.

9. The State offered evidence that Jordan made the following admissions implicating Terril: Jordan admitted that "he, his brother, and his girlfriend took the victim to a country road"; that "he, his brother, and his girlfriend were present when the victim was killed"; that "he, his brother, and his girlfriend took the victim on a road between Monticello and the Colorado state line and shot him 19 times"; that "he and his brother took the victim while the girl stayed at the car"; that "after the shooting him and his brother split up"; that "they went into the woods and shot him up"; that "they tortured him [and] they shot him up." The statements were redacted to re-

move reference to Terril, i.e., "his brother" (referring to Terril) was omitted, and "they" (referring to both brothers) was replaced with "he" (referring to Jordan). The State also offered evidence of a number of admissions that implicated Jordan alone.

10. We have stated that " 'we will not set aside a verdict because of the erroneous exclusion of evidence unless a proffer of evidence appears of record.' " *State v. Telford*, 940 P.2d 522, 526 (Utah Ct.App.1997) (quoting *State v. Rammel*, 721 P.2d 498, 499 (Utah 1986)). Jordan has made no claim that something beyond the redacted portion of his admissions could have been produced on cross. We therefore decline to speculate upon whether other evidence might have come forward in an unlimited cross.

and his cross-examination could have been no more fruitful. We therefore find no prejudice to Jordan in the limits the trial court placed on cross-examination.

## III. PHOTOGRAPHS OF THE CRIME SCENE

¶ 33 Jordan claims the trial court erred in admitting the State's exhibits # 4 and # 5, which contained photographs of Eaton's body at the crime scene. Jordan asserts that the photographs were gruesome and had little or no probative value and should therefore have been excluded.

¶ 34 We have held that some categories of evidence, including gruesome photographs, are inherently prejudicial and should not be admitted absent a showing of "unusual probative value." *State · v. Kell,* 2002 UT 19, ¶¶ 25–26, 440 Utah Adv. Rep. 20; *State v. Vargas,* 2001 UT 5, ¶¶ 50–56, 20 P.3d 271; *State v. DeCorso,* 1999 UT 57, ¶ 53, 993 P.2d 837; *State v. Dunn,* 850 P.2d 1201, 1221–23 (Utah 1993); *State v. Bishop,* 753 P.2d 439, 493 (Utah 1988) (Zimmerman, J., concurring); *State v. Dibello,* 780 P.2d 1221, 1229 (Utah 1989); *State v. Lafferty,* 749 P.2d 1239, 1256 (Utah 1988); *see also State v. Cloud,* 722 P.2d 750, 752–54 (Utah 1986); *State v. Garcia,* 663 P.2d 60, 63–65 (Utah 1983). The State urges this court to overrule this precedent and consider all evidence, whether gruesome or not, under the same standard of rule 403. Having recently rejected this argument and clarified the purpose of the presumption, *see State v. Bluff,* 2002 UT 66, ¶¶ 40–47, 452 Utah Adv Rep. 13, 52 P.3d 1210 we decline to repeat our reasoning here.

¶ 35 As we stated in *Bluff,* a court should undertake a three-step analysis when considering whether to admit crime scene photographs:

> First, we look to whether the photograph is relevant. Second, we consider whether the photograph is gruesome. Finally, we apply the appropriate balancing test. If the photograph is gruesome, it should not be admitted unless the State can show that the probative value of the photograph outweighs the risk of unfair prejudice. If the photograph is not gruesome, it should be

admitted unless the defendant can show that the risk of unfair prejudice outweighs the probative value of the photograph.

*Id.* at ¶ 46:

> ¶ 36 In considering the trial court's admission of exhibits # 4 and # 5, we review the trial court's determination of whether the photographs were relevant for abuse of discretion. *See Bambrough v. Bethers,* 552 P.2d 1286, 1290 (Utah 1976). The determination of whether a photograph is gruesome is a question of law, which we review for correctness. *Dunn,* 850 P.2d at 1222 n. 22. A trial court's ruling under rule 403 is reviewed for abuse of discretion. *Kell,* 2002 UT 19 at ¶ 24. "Even if the evidence was erroneously admitted, that fact alone is insufficient to set aside a verdict unless it has 'had a substantial influence in bringing about the verdict.'" *Bambrough,* 552 P.2d at 1290 (quoting Utah R. Evid. 4(b) (1971)); *see also* Utah R. Evid. 103(a) (erroneous ruling requires reversal only if "a substantial right of the party is affected").

¶ 37 When the State moved to admit the photos, Jordan objected, arguing that the photos were not relevant because the manner, place, and conditions of Eaton's death were not disputed. The court nonetheless admitted the photos, finding that they were "relevant in showing what it looked like, at least soon after the person died, ah, where it was and what position he was [in]." Further, the court found that while the photos were "certainly not pleasant to look at," they did not meet the legal definition of gruesomeness.

¶ 38 We first consider relevance. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Utah R. Evid. 401. Because there was no dispute regarding how or where the victim was killed, the only question at issue was who committed the murder. Jordan argued and brought evidence to suggest that Ernst's testimony and the testimony of persons who had been in jail with Jordan were unreliable. Whether or not these witnesses were credible was a fact of consequence in considering whether Jordan was guilty, and the photographs had some tendency to make their testimony more likely true. The photo-

graphs show the landscape where Eaton was found and show that he had been shot several times. This corresponds with the area described by Ernst and her testimony that she heard numerous shots fired. The photos also show bullet wounds in Eaton's arms. This corresponds with the statements by some witnesses that Jordan had told them Eaton had tried to shield himself from the bullets with his hands. Given the photographs' connection with the testimony of witnesses whose credibility was in question, we hold that the trial court did not abuse its discretion in finding the photographs relevant.

¶ 39 We next consider whether the photographs are gruesome. The purpose of this inquiry is to determine whether the photographs have a tendency to "unfairly prejudice, inflame, or mislead the jury." *Lafferty,* 749 P.2d at 1256. The exhibits include six color photographs of the victim lying on the ground and covered with a light dusting of snow. The victim's face is visible in three of the photographs, one of which is a slightly closer view than the others. Bullet wounds are visible as dark dots in the body, and there is a small amount of dark, dried blood near some of the wounds. While disturbing, the photographs do not rise to the level that we have found gruesome in other cases. The photos do not show a great deal of blood, *compare DeCorso,*1999 UT 57 at ¶ 52, 993 P.2d 837 *with Bishop,* 753 P.2d at 476, *Dibello,* 780 P.2d at 1230, *Lafferty,* 749 P.2d at 1257, and *Cloud,* 722 P.2d 750, 753 (Utah 1986), nor has the body been manipulated in any way to emphasize the wounds, *cf. Bishop,* 753 P.2d at 476; *Lafferty,* 749 P.2d at 1257. The surrounding landscape carries no strong connotations that would make the images more inflammatory. *Cf. Lafferty,* 749 P.2d at 1257. The single close-up is taken from relatively far away and gives little detail about the wound in the victim's face. *Cf. Bishop,* 753 P.2d at 476. Based on considering each image as a whole, we find that the photographs are not inherently prejudicial.

¶ 40 Having found the photographs not gruesome, we consider whether the trial court abused its discretion in admitting the photographs under rule 403. Under that rule, the court must admit relevant evidence unless the risk of unfair prejudice substantially outweighs the probative value of the evidence. Utah R. Evid. 403. As discussed above, the photos were of limited probative value, serving only to corroborate uncontested facts in Ernst's and other witnesses' testimony. While not gruesome, the photos are disturbing enough that they posed a risk of unfairly prejudicing the jury. However, given that the credibility of Ernst was of great importance in the case and hotly contested by the parties, and given that the photographs corroborated other witnesses' testimony, we cannot say that the trial court abused its discretion in finding that the risk of prejudice did not outweigh the probative value of the photos. *See DeCorso,*1999 UT 57 at ¶ 54, 993 P.2d 837 ("[P]hotographs of the victim are not excluded by rule 403 simply because the State could have established the same facts through other evidence."). We therefore find no error in the trial court's admission of the crime scene photographs.

## CONCLUSION

¶ 41 We hold the claims raised by Jordan on appeal are without merit. The trial court did not abuse its discretion in denying the motion for a psychological examination of the State's primary witness. The trial court did not err in redacting Jordan's statements, allowing counsel to lead the witnesses, and limiting the scope of cross-examination. And the photographs of the crime scene objected to by Jordan do not rise to the level of gruesomeness that would require reversal. We therefore affirm the conviction.

¶ 42 Associate Chief Justice DURRANT, Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Chief Justice DURHAM's opinion.