2009 UT App 91

**STATE of Utah, Plaintiff and Appellee,**

v.

**Mike Cory BARBER, Defendant and Appellant.**

No. 20060663–CA.

Court of Appeals of Utah.

April 9, 2009.

Lori J. Seppi, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Karen A. Klucznik, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before Judges GREENWOOD, McHUGH, and BILLINGS.[1]

## OPINION

McHUGH, Judge:

¶1 Mike Cory Barber appeals his conviction of child abuse, *see* Utah Code Ann. § 76-5-109 (2008). We reverse and remand for a new trial.

## BACKGROUND [2]

¶2 On March 2, 2005, two-year-old D.A. was flown by Life Flight to Primary Children's Medical Center. D.A. was suffering from a traumatic brain injury that necessitated removing half of his skull; trauma to his eye that ultimately resulted in blindness; five broken bones; and "multiple bruises to many different body surface areas, most of which are in protected locations," including his ear, chest, back, groin, and face.

¶3 Barber was in a relationship with D.A.'s mother, JenaV Adams. In February 2005, Barber moved in with Adams and her son, D.A., and daughter, A.A. Adams worked full-time, and Barber was unemployed. Barber watched the children while Adams was at work.

¶4 On Sunday, February 27, Adams bathed D.A. and prepared him for bed. She noticed nothing unusual about his health or appearance. The next morning, Adams left the children with Barber and went to work. About three hours later, Barber called Adams and indicated that while he was doing laundry in the basement, he "heard a thud" from upstairs where the two children were playing. Barber reported that A.A. had observed D.A. jumping on the couch and falling on the fireplace's raised hearth and that D.A. "had hit his face and ... his nose was bleeding." Barber assured Adams that D.A. was "okay" and that Barber had "wiped him up" and "was going to lay him down."

¶5 A short time later, a friend of Adams, who had seen D.A., convinced Barber to call Adams again and tell her that D.A.'s arm appeared to be broken. Adams returned home and observed that D.A.'s "arm was hanging, it looked broken. There was ... [what] looked like two bruises on his face, and his lip was bloody." Adams took D.A. to Pioneer Valley Hospital where he was diagnosed as having broken both of the bones in his left forearm. D.A.'s arm was placed in a cast the next day. Adams also observed new bruising on D.A.'s right shoulder and lower back. Although Adams argued with Barber about D.A.'s injuries, she did not alert the authorities to her suspicions. In addition, none of the doctors who treated D.A. independently concluded that D.A. had been abused.

¶6 Two days after D.A.'s first injuries, March 2, 2005, Barber and the two children dropped Adams at work around 8:30 a.m. About an hour later, Adams talked to D.A., who sounded normal and healthy.

¶7 A clerk at a nearby RiteAid, Ivy Owens, testified that she saw Barber and the two children in the store on that same morning at about 9:00 a.m. Owens testified that she heard a child crying and that "[i]t sounded like a hurt cry, like somebody was hurting." She also "heard a slapping noise." Owens walked toward the crying child and saw Barber hit him "across the head or the neck." Owens then walked back to her register and notified her supervisor. Barber later approached Owens's cash register to purchase his items. At the register, Barber "was standing there with the boy and ... he was looking at the back of the boy's neck and ... he said, 'What in the hell is this? What's going on here?'" Barber then put his finger to his mouth and "motioned to the little girl like this, shhh." "At some point [during the transaction], he said to [Owens], 'You don't think that I would'—and then stopped."

¶8 "Between 10:30 and 11:00," Adams received another call from Barber, who was now home. Barber said he had been bathing D.A. and went downstairs "to get a towel

---

1. The Honorable Judith M. Billings, Senior Judge, sat by special assignment pursuant to Utah Code section 78A-3-102 (2008) and rule 11-201(6) of the Utah Rules of Judicial Administration.

2. "When reviewing a jury verdict, we recite the facts in the light most favorable to that verdict." *State v. Carreno*, 2006 UT 59, ¶3, 144 P.3d 1152.

[when] ... he heard a thud." Barber told Adams that "D[.A.] slipped and fell in the [bathtub] and he's not responding." Adams "told [Barber] to call 9–1–1."

¶ 9 When paramedics arrived approximately five minutes after being called, D.A. was lying in the living room on his back. The paramedics testified that Barber was acting nervously and that his behavior seemed odd. D.A.'s hair and cast were dry, and he was dressed in a diaper, pants, and a shirt. Barber told a police officer that he had dressed D.A. so that the child would not be cold. The evidence conflicted on whether the bathtub had recently been used.

¶ 10 D.A. was flown by helicopter to Primary Children's Medical Center, where he was treated by a team of medical professionals. Because D.A. was suffering from subdural bleeding that "covered the entire surface of the brain on the right side," the doctors removed that half of his skull to relieve the pressure. The doctors also placed a permanent shunt to drain fluid from D.A.'s brain into his stomach. A subsequent full body scan revealed that D.A.'s right arm, the one not already in a cast, and his collar bone were broken. Although D.A. "wasn't expected to make it," he survived and was released after sixty-three days in the hospital.

¶ 11 Despite saying he was anxious to be with D.A., Barber never went to the hospital. Instead, he "took [Adams's] car and left a message on [her] cell phone, saying that he had dumped [the] car at a car wash and the keys were in the trunk." When police officers located Barber more than a month later, he had shaved his head, grown a beard, and "was a lot skinnier." The police asked Barber why he did not visit D.A. at the hospital, and Barber "[s]aid that he had just been to jail and he didn't want to go to jail again."

¶ 12 Barber was charged by information with child abuse on March 4, 2005.[3] At an initial appearance on April 15, 2005, Barber was informed of his right to counsel. Barber indicated that he would hire private counsel,

but a short time later, he requested that the Legal Defender's Association (the LDA) be appointed to represent him. After reviewing Barber's affidavit of indigency, the trial court granted Barber's request on April 26, 2005. Barber's trial was scheduled to begin February 28, 2006.

¶ 13 On February 13, 2006, Barber retained private counsel and the court granted counsel's request for a continuance. The LDA then withdrew and delivered a complete copy of Barber's file to private counsel. That file included contact information for Dr. Rothfeder, a medical expert the LDA had engaged for the defense.

¶ 14 On March 18, 2006, Barber's private counsel individually "and at the request of [Barber]" attempted to withdraw as counsel. In a minute entry dated March 23, the trial court ruled that it "w[ould] not allow defendant's counsel to withdraw at this time." No further analysis was provided. Barber's private counsel again moved to withdraw at the April 3 pre-trial conference, declaring that "it appears that [Barber] is really not able to sustain the fees that are involved, and [he] has indicated that he would like to go back to the [LDA] for representation." The court again denied Barber's request to dismiss private counsel and to be represented by the LDA instead. Private counsel immediately requested a continuance, arguing that he had been ill and, therefore, was not prepared for trial. The court refused the request because trial was not scheduled until April 18, which meant counsel would "have plenty of time to be ready."

¶ 15 The case proceeded to trial on two counts of child abuse, one allegedly stemming from a fall into the fireplace reported on February 28, 2005 (the fireplace incident), and the other allegedly caused by a fall in the bathtub reported on March 2, 2005 (the bathtub incident).[4] Private counsel offered no expert testimony for the defense. The jury acquitted Barber with respect to the fireplace incident but convicted him on the

---

3. The original information charged Barber with five counts of abuse. On April 18, 2006, an amended information was filed, which included only the two counts addressed at trial.

4. We refer to the charges as the fireplace and bathtub incidents for convenience to the reader and not as a comment on Barber's veracity or the jury's verdict.

charges stemming from the bathtub incident. Barber appeals that conviction.

## ISSUES AND STANDARDS OF REVIEW

 ¶ 16 Barber presents three issues on appeal. First, Barber argues that he received ineffective assistance of counsel when his attorney failed to investigate the need for or to hire an expert to interpret D.A.'s medical records. "In ruling on an ineffective assistance claim following a [r]ule .23B hearing, we defer to the trial court's findings of fact, but review its legal conclusions for correctness." *State v. Hernandez*, 2005 UT App 546, ¶ 13, 128 P.3d 556 (alteration in original) (internal quotation marks omitted).

 ¶ 17 Second, Barber claims that the trial court's denial of his motion to dismiss private counsel and return to the LDA violated his rights secured by the Sixth Amendment to the United States Constitution. *See* U.S. Const. amend. VI. Absent special circumstances, a "defendant's choice of retained counsel must be respected," *United States v. Collins*, 920 F.2d 619, 626 (10th Cir.1990), *superseded by statute on other grounds as recognized by Lewis v. Commissioner of Internal Revenue*, 523 F.3d 1272 (10th Cir. 2008), and "[w]here the right to be assisted by counsel of one's choice is wrongly denied, ... it is unnecessary to conduct an ineffectiveness or prejudice inquiry ...," *United States v. Gonzalez–Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (affirming reversal of defendant's conviction due to the trial court's refusal to allow defendant to proceed with his hired attorney of choice). However, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151, 126 S.Ct. 2557; *accord Caplin & Drysdale v. United States*, 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) ("[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). Thus, a defendant's request to substitute one public defender for another is reviewed for abuse of discretion. *See State v. Pursifell*, 746 P.2d 270, 272 (Utah Ct.App. 1987) ("Whether to appoint a different lawyer for an indigent defendant who expresses dissatisfaction with his court-appointed counsel, but who has no constitutional right to appointment of a different attorney, is a matter committed to the sound discretion of the trial court and will be reversed only for an abuse of discretion.").

 ¶ 18 Third, Barber asserts that the trial court committed reversible error by admitting photographs depicting D.A.'s injuries. Barber contends that the pictures are gruesome and, therefore, were likely to prejudice and inflame the jury. Even if the photographs are not considered gruesome, Barber argues that the trial court admitted them "in violation of rule 403 of the Utah Rules of Evidence." "A trial court's determination that photographs are relevant is reviewed for abuse of discretion. 'Whether a photograph is gruesome is a question of law, which we review for correctness.' The trial court's ultimate ruling under rule 403 ... is reviewed for abuse of discretion." *State v. Gulbransen*, 2005 UT 7, ¶ 35, 106 P.3d 734 (citations omitted).

## ANALYSIS

### I. Barber's Counsel Performed Deficiently, But Counsel's Deficiency Was Not Prejudicial.

¶ 19 Barber claims that his trial counsel rendered ineffective assistance.

[A] defendant is entitled to a new trial because of ineffective assistance of counsel if he proves (A) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (B) that ·but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different.

*State v. Hales*, 2007 UT 14, ¶ 68, 152 P.3d 321 (internal quotation marks omitted).

### A. Defense Counsel's Failure to Investigate the Availability of Exculpatory Expert Testimony Was Deficient.

 ¶ 20 Barber argues that his private counsel's performance was deficient because counsel failed to "investigate the availability

of expert testimony to support [his] defense," specifically that D.A.'s injuries were accidental. Barber was originally represented in this case by the LDA, which had retained Dr. Rothfeder as an expert witness. Dr. Rothfeder opined that D.A.'s injuries could have been caused accidentally—by a fall on the fireplace and again in the bathtub. Although Barber's private counsel received a copy of the LDA's files, including the name and contact information for Dr. Rothfeder, private counsel never contacted Dr. Rothfeder or any other expert. Instead, counsel relied solely on cross-examination of the State's experts to support Barber's primary defense theory. The jury convicted Barber of child abuse for the bathtub incident.

¶ 21 Barber appealed, claiming ineffective assistance of counsel, and we remanded to the trial court pursuant to rule 23B of the Utah Rules of Appellate Procedure for the entry of findings of fact necessary for a determination of that issue. *See* Utah R.App. P. 23B(a). On remand, Barber's private trial counsel admitted that an expert would have been "very" helpful in preparing the defense but that one was not hired because Barber lacked sufficient funds to pay an expert's fees. Rule 15 of the Utah Rules of Criminal Procedure provides that "[u]pon showing that a defendant is financially unable to pay the fees of an expert whose services are necessary for adequate defense, the witness fee shall be paid as if he were called on behalf of the prosecution." Utah R.Crim. P. 15(a). Furthermore, Utah law guarantees indigent defendants "public assistance for expert witnesses" irrespective of whether they are represented by the LDA or private counsel. *See State v. Burns,* 2000 UT 56, ¶¶ 31–32, 4 P.3d 795 ("There is no indication in [rule 15] that a defendant must be represented by [the] LDA to qualify for this assistance."). Consequently, Barber renews his argument that private trial counsel's performance was deficient, and we agree. The State concedes this point but asserts that Barber cannot show that he was prejudiced by that deficiency. We now address that issue.

**B. Counsel's Failure to Call an Expert Witness Was Not Prejudicial to Barber's Defense.**

¶ 22 "[E]ven when counsel's performance is inadequate, a defendant ... is not entitled to a new trial unless the defendant establishes that 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Hales,* 2007 UT 14, ¶ 86, 152 P.3d 321 (quoting *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). However, "we do not need to find that the jury would have more likely than not" acquitted Barber. *Id.* ¶ 92. Rather, "'[a] reasonable probability is a probability sufficient to undermine confidence in the [jury verdict].'" *Id.* ¶ 86 (second alteration in original) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

¶ 23 While Barber argues that the omission of Dr. Rothfeder's testimony was prejudicial, the State contends that it "was not even compelling enough to seriously challenge the State's experts' testimony." Notably, both parties rely on *State v. Hales,* 2007 UT 14, 152 P.3d 321, as support for their positions.

¶ 24 In *Hales,* the defendant was charged with murder when the child victim died from severe brain injuries he had suffered years earlier. *See id.* ¶ 1. The key evidence came from the interpretation of Computer Tomography (CT) scans performed shortly after the injury. *See id.* ¶ 69. Based on those scans, the prosecution's expert opined that the child suffered from shaken baby syndrome, which had occurred during a time when the defendant was the child's sole caretaker. *See id.* ¶ 28. Defense counsel never contacted a qualified expert to review the CT scans and offered no expert testimony regarding them. *See id.* ¶ 29. Instead, defense counsel focused entirely upon the theory that a near-miss car accident earlier in the day had caused the child's injuries. *See id.* Although the defense offered expert opinion to support this theory, it was sharply rebutted by the prosecution's expert, who testified that the CT scans conclusively disproved that theory. *See id.* ¶¶ 28–29. The defendant was convicted. *See id.* ¶ 29.

¶ 25 The *Hales* defendant moved for a new trial, claiming "that his trial attorneys rendered ineffective assistance because they failed to investigate the CT scans." *Id.* ¶ 30. In support of the motion, defendant provided an affidavit from a medical expert, who opined that the CT scans did not show shaken baby syndrome, or any other cause, but did prove that the injuries occurred six to twelve hours before the child was treated. *See id.* ¶ 31. This new testimony directly contradicted the state's expert and, "[i]f believed by a jury, . . . would establish that the injury to [the child] . . . happened prior to the time [the child] was in [the defendant's] care." *Id.* The trial court denied the motion, and the defendant appealed. *See id.* ¶ 33.

¶ 26 On appeal, the Utah Supreme Court emphasized that "[b]ecause the State had no witness to the cause of [the child's] injuries, the medical evidence in the case, and in particular the CT scans, was the primary source of information regarding what happened." *Id.* ¶ 74. Had defense counsel presented its "competing interpretation of the CT scan evidence" at trial, it would have "undermined the State's ability to use the CT scans to conclusively pin responsibility for [the child's] injuries on [the defendant]." *Id.* ¶ 91. Accordingly, the *Hales* court determined that there was a reasonable possibility that the omitted expert testimony may have created a reasonable doubt in the mind of the jury and reversed the defendant's conviction. *See id.* ¶¶ 92–93.

¶ 27 The current case is both similar to and distinguishable from *Hales*. As in *Hales*, the medical evidence in this case is the primary source for determining what happened .to D.A. And, as in *Hales*, Barber's trial counsel did not investigate or present expert testimony regarding the medical evidence. However, in *Hales*, the CT scan evidence was crucial, in part, because no other indicators of child abuse were present:

> [The doctors] noted bruising on [the child's] face, but there was no evidence of an impact injury, no neck injury, no injuries to the trunk of his body, and no healed fractures or similar evidence of prior abuse. Additionally, there were no identifiable finger or hand marks on [the child].

*Id.* ¶ 10. Here, the State's experts relied upon all of D.A.'s injuries, including bruising in protected areas, apparent finger· or pulling marks, multiple broken bones, an apparent bite mark, and the severe head injury, to support their opinions that D.A.'s injuries were inflicted.

¶ 28 Furthermore, in *Hales*, the State's expert and the expert supporting the defendant's new trial motion reached completely different conclusions, each of which disproved the other. *See id.* ¶ 91. The effect of the lack of expert testimony for the defense is more difficult to ascertain in this case because the expert testimony presented by the State's witnesses and that offered by Dr. Rothfeder do not directly conflict. A brief review of the State's three expert witnesses as well as Barber's proposed expert, Dr. Rothfeder, demonstrates this point.

¶ 29 Linda Lewis, a nurse practitioner who had evaluated more than 1000 suspected abuse cases, was the State's first expert witness. Lewis testified that, based primarily on D.A.'s bruising and broken bones, she believed his injuries were the result of "inflicted trauma." However, Lewis admitted she could not tell when that trauma occurred or who inflicted it. She also acknowledged that at least some of D.A.'s injuries could have been accidental.

¶ 30 Second, the State called Dr. Karen Hansen, a pediatrician experienced in evaluating abuse cases. Dr. Hansen opined that D.A.'s bruising patterns, head injury, and broken bones indicated that he had suffered inflicted trauma. Much like nurse practitioner Lewis, however, Dr. Hansen acknowledged the possibility, although she deemed it remote, that some of D.A.'s injuries could have been accidental. She also was uncertain when the trauma occurred.

¶ 31 Third, the State called Dr. Marion Walker, a nationally recognized pediatric neurosurgeon who provided the principal testimony regarding the source and timing of D.A.'s head injury. Dr. Walker testified that D.A.'s head injury occurred within a few hours of his arrival at the hospital on the day of the bathtub incident. Unlike the two prior experts, Dr. Walker was not asked, and

therefore did not testify as to, whether there was any possibility that D.A.'s head injury could have been accidental. Rather, he stated that "the story, as told, being in the [bathtub], does not explain the force necessary to create this injury," even if D.A. had hit the faucet during a fall in the bathtub.

¶ 32 Although the defense offered no expert testimony at trial, Dr. Rothfeder testified during the rule 23B hearing on remand. He stated that it "was certainly possible" that D.A.'s head injury had "been caused by a fall in the bathtub," that it was possible that D.A.'s "broken bones could have been caused from jumping off the couch and falling onto the brick fireplace," and that the bruising could have been caused by another source. Nevertheless, Dr. Rothfeder, agreed that "there [we]re [a] number[ ] of injur[ies] ... that [we]re consistent with child abuse" or "would be suspicious for potential abuse," and he acknowledged that D.A.'s injuries could have been inflicted. In short, according to Dr. Rothfeder, abuse, accident, or both could explain D.A.'s condition.

¶ 33 Unlike the omitted expert testimony in *Hales*, Dr. Rothfeder's testimony, if believed, would not necessarily establish Barber's innocence. *See State v. Hales*, 2007 UT 14, ¶¶ 91–92, 152 P.3d 321 (noting that if believed, the defense expert's testimony would establish that the defendant was not with the child victim at the time of his injury). The entire thrust of Dr. Rothfeder's testimony was to establish the mere possibility that D.A.'s injuries could have been accidental, a concession both nurse practitioner Lewis and Dr. Hansen made with respect to D.A.'s bruises and fractures. For example, when nurse practitioner Lewis was asked whether falling from the couch and hitting the fireplace could have caused bruising or broken bones, she answered, "Maybe. Maybe." Likewise, Dr. Hansen admitted that if the fall onto the fireplace were a "reliably witnessed accident," it would explain D.A.'s broken arm. To the extent Dr. Rothfeder's testimony would have simply reiterated the possibility that D.A.'s bruises

and fractured bones may have been accidental, we see no prejudice from its omission. *See generally Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir.2005) (finding omission of defense expert was not prejudicial when expert was prepared to testify regarding the possibility of an innocent explanation and the state's experts had already conceded that possibility).

■ ¶ 34 We agree with the defense, however, that the prejudicial effect of the omission of Dr. Rothfeder's testimony regarding D.A.'s head injury is more problematic. Unlike the bruising and fractured bones, there is nothing in the trial record that indicates any of the State's experts conceded that D.A.'s head injury could have been accidentally inflicted.[5] We accordingly must evaluate the prejudice of omitting Dr. Rothfeder's testimony against Dr. Walker's opinion that a fall in the bathtub does not explain the force necessary to cause D.A.'s head injury. "Because '[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect,' in determining the effect of the error, we 'consider the totality of the evidence before the ... jury.'" *Hales*, 2007 UT 14, ¶ 86, 152 P.3d 321 (alteration and omission in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 695–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Consideration of the totality of the evidence does not undermine our confidence in the verdict. Therefore, we agree with the State that Barber has not been prejudiced. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Hales*, 2007 UT 14, ¶ 86, 152 P.3d 321.

¶ 35 Unlike in *Hales*, there is other significant evidence that supports the jury's verdict here. Barber was observed hitting D.A. at RiteAid; acted strangely when the paramedics arrived; lied to the officer at the scene about his plan to go immediately to the hospital; attempted to elude the police by taking his girlfriend's car and changing his appear-

---

5. At trial, none of the State's experts was asked directly whether the head injuries could have been accidental. During the rule 23B remand, to which the jury was not privy, Dr. Walker testified, "I would not say it's impossible. I would say it would be so extremely rare as to be remarkable."

ance; and when located over a month later, admitted that he fled because did not want to return to jail. In addition, there was conflicting evidence on whether the bathtub was actually used immediately before the bathtub incident.[6]

¶ 36 Furthermore, the *Hales* court explained that the failure to provide expert testimony on the CT scans was prejudicial "because there is a likelihood that [the defendant]'s attorneys would have discovered compelling evidence challenging the State's theory regarding the timing of the injuries if they had hired a qualified expert to read the CT scans." *Hales*, 2007 UT 14, ¶ 3, 152 P.3d 321. Dr. Rothfeder's testimony on remand simply did not provide such "compelling evidence." While in *Hales* a defense expert "would likely [have] alter[ed] the defense's theory at trial as well as the entire evidentiary picture presented to the jury," *id.* ¶ 89, the same cannot be said here. Indeed, Dr. Rothfeder agreed with the State's experts that some of D.A.'s bruising was in areas less commonly affected by a fall, that there were suspicious injuries on D.A., and that when considered cumulatively, D.A.'s injuries were consistent with child abuse. Although when asked to consider certain injuries in isolation, Dr. Rothfeder opined that it is possible the head injury was caused by a fall in the bathtub and that it is also possible that all of the broken bones were caused by a single accident, that testimony would not have altered the defense's theory or the evidentiary picture as a whole. *See id.*

¶ 37 Barber's defense and the evidentiary picture presented to the jury would remain unchanged: Barber contends that D.A.'s injuries were accidental, while the State argues that the injuries were inflicted. In *Hales*, the Utah Supreme Court held that a new trial was warranted because the probability that the defense testimony interpreting the CT scans would have raised reasonable doubt undermined the court's confidence in the ver-

dict. *See id.* ¶ 92. However, the *Hales* court limited its holding to the unique facts before it, stating, "That standard is met on the facts of this case because [the defendant]'s trial attorneys' failure to investigate had a 'pervasive effect' on the key evidence at trial." *Id.* We conclude that Dr. Rothfeder's testimony would not have had a similarly pervasive impact in this case.

¶ 38 Considering all of the evidence, our confidence in the outcome remains strong, and we reject Barber's assertion that but for the failure to provide a defense expert, there is a reasonable probability he would not have been convicted of the charge related to the bathtub incident. *See id.* ¶ 86 (citing *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052). We therefore conclude that Barber was not prejudiced by his counsel's ineffectiveness.

## II. Barber had a Sixth Amendment Right to Dismiss Retained Counsel

¶ 39 Because we conclude that Barber was not prejudiced by the absence of a defense expert, we now address his claim that the trial court erred when it denied his motion to dismiss private counsel. Barber first attempted to dismiss his retained counsel and return to the LDA on March 18, 2006.[7] The trial court denied the motion without comment. Barber renewed his motion to substitute counsel on April 3, 2006, and the trial court again denied it. On appeal, Barber argues that the trial court violated his Sixth Amendment right to counsel. In response, the State asserts that Barber was not entitled to have public counsel appointed and that Barber's motion was untimely.

 ¶ 40 The State argues that Barber's Sixth Amendment argument should be considered under the analysis applied when a defendant attempts to change from one public attorney to a different public attorney. "An indigent defendant ... has no right to have a particular lawyer represent him and

---

6. We acknowledge that this evidence was not enough to convince the jury beyond a reasonable doubt that Barber was guilty of the charges related to the fireplace incident. However, with respect to those injuries, the treating physicians noticed nothing suspicious and there was evidence to suggest that Barber's explanation had

been corroborated by D.A.'s four-year-old sister, A.A.

7. Barber filed an affidavit of indigency, which was approved by the trial court, prior to the initial appointment of the LDA as Barber's counsel.

can demand a different appointed lawyer only with good cause." *United States v. Gallop,* 838 F.2d 105, 108 (4th Cir.1988). In such cases, the appellate court considers three factors when determining whether the trial court exceeded its discretion in denying a motion to have a different public defender appointed: "(1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the motion; and (3) the ability of the defendant and his counsel to communicate and to formulate a defense, despite the alleged conflict." *United States v. Burgos,* 539 F.3d 641, 645–46 (7th Cir.2008) (discussing the "public counsel" test).

¶ 41 The rule applied where a defendant makes a timely motion to dismiss his retained counsel is less restrictive. "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.'" *United States v. Gonzalez–Lopez,* 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (alteration and omission in original) (quoting U.S. Const. amend. VI).[8] "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *Id.; see also United States v. Collins,* 920 F.2d 619, 625 (10th Cir.1990) ("Attorneys are not fungible; often the most important decision a defendant makes in shaping his defense is his selection of an attorney." (internal quotation marks omitted)), *superseded by statute on other grounds as recognized by Lewis v. Commissioner of Internal Revenue,* 523 F.3d 1272 (10th Cir.2008).

■■■■ ¶ 42 Even in the context of retained counsel, however, "the right to counsel of choice 'is circumscribed in several important respects.'" *Gonzalez–Lopez,* 548 U.S. at 144, 126 S.Ct. 2557 (quoting *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). For example, counsel must be a member of the bar, must be willing to represent the defendant, and must be free of conflicts or other ethical limitations. *See Wheat,* 486 U.S. at 159, 108 S.Ct. 1692. Assuming none of these limitations is present, the court should also consider whether the appointment or substitution of counsel would unreasonably delay the proceedings before the court. *See, e.g., Collins,* 920 F.2d at 625 ("[A] defendant's right to retain counsel of his choice ... may not be insisted upon in a manner that will obstruct an orderly procedure in courts of justice ...." (internal quotation marks omitted)); *United States v. Panzardi Alvarez,* 816 F.2d 813, 816 (1st Cir.1987) ("An accused's right to choose his own counsel cannot be manipulated to delay proceedings or hamper the prosecution.").

■■■■ ¶ 43 Thus, if the trial court determines that substitution or appointment of counsel would obstruct the orderly procession of the case, for example, if "a defendant attempts to substitute counsel at the eleventh hour or in mid-trial, [the defendant] must show good cause [for the change in counsel,] such as a conflict of interest, a breakdown in communication or an irreconcilable dispute with his attorney." *Panzardi Alvarez,* 816 F.2d at 816; *see also United States v. Brumer,* 528 F.3d 157, 160–61 (2d Cir.2008) (per curiam) (applying test to determine whether there was a communication breakdown when defendants sought to replace retained counsel in an untimely manner). If none of these limitations exists, "[a] defendant's choice of retained counsel must be respected." *Collins,* 920 F.2d at 626 (internal quotation marks omitted).

■■■■ ¶ 44 The State contends that, because Barber was requesting the appointment of the LDA, he had to demonstrate good cause for the substitution irrespective of whether it was timely. In contrast, Barber argues that the failure to allow him to choose who represents him violated his Sixth Amendment protections, even in the absence of a showing of good cause or prejudice to the State. The parties' arguments highlight the difference between the private and public counsel tests when a timely motion to substitute counsel is made.

---

8. Because Barber has not argued that any of his rights secured by the Utah Constitution were violated, we consider only the argument that Barber's Sixth Amendment rights under the Federal Constitution were violated and rely on opinions interpreting that amendment.

¶ 45 Assuming that incoming counsel is willing and ethically available, a defendant has a Sixth Amendment right to fire retained counsel and hire new retained counsel irrespective of the defendant's reasons for doing so, so long as the substitution does not unreasonably disrupt the proceedings. *See Gonzalez–Lopez,* 548 U.S. at 148, 126 S.Ct. 2557; *Wheat,* 486 U.S. at 159, 108 S.Ct. 1692. In the case of publicly-funded counsel, however, even a timely motion must be supported by a showing of good cause. *See Gonzalez–Lopez,* 548 U.S. at 151, 126 S.Ct. 2557. The resolution of Barber's Sixth Amendment challenge requires us to decide, for the first time in Utah, whether the test applicable to a change in private counsel or the one used to assess a request for a change in public counsel should be applied where Barber sought to dismiss private counsel in favor of public representation.

¶ 46 Despite the State's assumption that the public counsel test is applicable when a defendant seeks to replace his retained counsel with appointed counsel, it offers no authority for that position.[9] And, we have found few cases that have addressed the unique question presented here.[10] Of those decisions, we consider the analysis in *People v. Ortiz,* 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547 (1990), the most thoughtful.

¶ 47 In *Ortiz,* the California Supreme Court was asked to "resolve a conflict in the [California] Courts of Appeal regarding the duty of a trial court when a defendant who has retained counsel, but becomes indigent, makes a timely motion to discharge his attorney and obtain court-appointed counsel." *Id.* 275 Cal.Rptr. 191, 800 P.2d at 549.[11] The court noted two strong arguments for rejecting the use of the rule applicable to requests by an indigent defendant to change from one public defender to a different public defender.

¶ 48 First, the *Ortiz* court reasoned that there was little appreciable difference between a defendant who has money to hire another private attorney and a defendant who lacks such funds. *See id.* 275 Cal.Rptr. 191, 800 P.2d at 553.

> In fact, [to the extent there is a difference] . . . it may even be more important for an indigent defendant to be able to discharge retained counsel: if his motion is denied, he must choose between proceeding with no legal assistance or continuing with a retained attorney reluctantly serving on a pro bono basis. . . .
>
> The risk in compelling a defendant to go to trial with unpaid counsel against his wishes and those of his attorney, is that the defendant will "get what he paid for."
>
> . . . .

9. ·Although the State did provide the court with supplemental authorities pursuant to rule 24(j) of the Utah Rules of Appellate Procedure, neither of the cases submitted considered a request to dismiss an indigent defendant's privately retained counsel. *See United States v. Gonzalez–Lopez,* 548 U.S. 140, 142–44, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (holding the defendant is not required to show prejudice where trial court denied his timely motion to retain hired counsel of choice); *United States v. Van Anh,* 523 F.3d 43, 48 n. 3 (1st Cir.2008) (refusing to apply the *Gonzalez–Lopez* analysis to an indigent defendant's request to change from one public attorney to another public attorney), *cert. denied,* —— U.S. ——, 128 S.Ct. 2917, 171 L.Ed.2d 851 (2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 234, 172 L.Ed.2d 179 (2008), *and cert. denied,* —— U.S. ——, 129 S.Ct. 236, 172 L.Ed.2d 180 (2008).

10. *See, e.g., United States v. Mullen,* 32 F.3d 891, 893, 895 (4th Cir.1994) (applying public counsel test without discussion); *People v. Ortiz,* 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547, 551 (1990) (holding that "a defendant—whether indigent or not—who seeks in a timely manner to discharge retained counsel, ordinarily should be permitted to do so," and resolving the conflict among California Courts of Appeal on this issue. *Compare People v. Stevens,* 156 Cal.App.3d 1119, 203 Cal.Rptr. 505 (1984) (holding inconsistently with *Mullen* ), *with South v. Superior Court,* 188 Cal.App.3d 1055, 233 Cal.Rptr. 765 (1986) (holding consistently with *Mullen* ) *and People v. Barnes,* 146 Cal.App.3d 663, 194 Cal.Rptr. 317 (1983) (same); *Dixon v. Owens,* 865 P.2d 1250, 1252–53 (Okla.Crim.App.1993) (rejecting public counsel test). *See also United States v. Woodard,* 291 F.3d 95, 107 (1st Cir.2002) (questioning whether the public counsel analysis is applicable where defendant seeks to dismiss paid counsel).

11. The defendant in *People v. Ortiz,* 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547 (1990), was ruled indigent and was briefly represented by a public defender before private counsel entered an appearance on his behalf. *See id.* 275 Cal. Rptr. 191, 800 P.2d at 550.

... [We] recognize that one possible result of requiring an unwilling attorney to represent a defendant without compensation is that [s]ome attorneys may find shortcuts particularly seductive.

*Id.* 275 Cal.Rptr. 191, 800 P.2d at 553–54 (internal quotation marks omitted); *see also State ex rel. Scott v. Roper,* 688 S.W.2d 757, 768 (Mo.1985) ("The quality of the uncompensated service can be expected to decrease in almost direct proportion to the loss of choice of the professional rendering the service."); *State ex rel. Wyo. Workers' Comp. Div. v. Brown,* 805 P.2d 830, 854–55 (Wyo.1991) (noting risk that inadequate compensation may produce inadequate representation).[12]

¶ 49 Second, the *Ortiz* court declared that "the policy concerns underlying the rule that a defendant generally is not entitled to more than one appointed attorney are irrelevant when an indigent criminal defendant ... makes a timely motion to discharge his retained attorney and obtain a public defender." 275 Cal.Rptr. 191, 800 P.2d at 554 (emphasis omitted) (citation omitted). While a defendant who already has appointed counsel will "continue to be represented by an attorney at public expense" even if his request for substitute counsel is denied, *id.* 275 Cal.Rptr. 191, 800 P.2d at 555, the indigent represented by private counsel will be "represented by coerced, unpaid counsel," *id.* The *Ortiz* court concluded that "there is no interest compelling us to treat an indigent defendant any differently from a nonindigent defendant when he moves to discharge his retained counsel," *id.,* and held that the court must not consider the indigency of the defendant when entertaining a timely motion to dismiss retained counsel. *See id.*

¶ 50 We agree with the reasoning of *Ortiz* and reject the invitation to consider Barber's challenge under the public counsel test. Consequently, Barber was not required to offer any explanation for his motion to dismiss his privately retained trial counsel. Rather, if substitute counsel was ready, willing, and ethically able to represent Barber, *see Wheat v. United States,* 486 U.S. 153,

159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the trial court should have granted the motion unless the change in counsel would have unreasonably delayed or disrupted the proceedings. *See, e.g., United States v. Collins,* 920 F.2d 619, 625 (10th Cir.1990), *superseded by statute on other grounds as recognized by Lewis v. Commissioner of Internal Revenue,* 523 F.3d 1272 (10th Cir.2008); *United States v. Panzardi Alvarez,* 816 F.2d 813, 816 (1st Cir.1987).

¶ 51 Thus, we now consider the State's argument that Barber's request to substitute counsel was properly denied as untimely. "[A] defendant's right to retain counsel of his choice ... may not be insisted upon in a manner that will obstruct an orderly procedure in courts of justice...." *Collins,* 920 F.2d at 625 (internal quotation marks omitted). Thus, we examine whether such disruption would have occurred here. Barber's first motion to dismiss private counsel in favor of public representation was made one month before the scheduled trial date of April 18, 2006, and denied without explanation by a minute entry five days later. At the time of the renewed motion, fifteen days before trial, Barber's private counsel explained that he had been too ill to prepare and that Barber was unable to pay for his services. When the trial court again denied the motion to substitute the LDA, private counsel moved for a continuance. The trial court refused to grant a continuance, stating, "You have plenty of time to be ready...."

¶ 52 Barber argues that if retained counsel had sufficient time to prepare for trial, we can presume that the LDA could likewise have been ready. Although one month—the time remaining when Barber first sought to dismiss private counsel—may not be sufficient to prepare for trial in many first degree felony cases, the facts of this case suggest otherwise. Here, the LDA represented Barber for almost ten months before private counsel appeared, and private counsel retained the case for only one month before he moved for substitution of the LDA.[13] Never-

---

12. The fact that the LDA had solicited the opinion of an expert, while private counsel declined

to do so, illustrates the danger anticipated by these courts.

13. The LDA was appointed on April 26, 2005,

theless, the trial court denied the motion, apparently on the ground that fifteen days gave private counsel sufficient time to prepare.

¶ 53 However, whether private counsel could be ready to try the case is not determinative of whether Barber had a right to dismiss private counsel in favor of returning to the LDA. As has been discussed, a defendant's request to dismiss retained counsel in favor of willing and ethically available substitute counsel should generally be granted, if timely asserted and not otherwise unduly disruptive. *See United States v. Gonzalez–Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Unfortunately, the comments of the trial court here are minimal and do not explain why or whether it concluded that the motion was untimely. Assuming for purposes of this analysis that the trial court considered Barber's motion untimely, we must determine whether the trial court exceeded its discretion in reaching that conclusion. *See United States v. Lott*, 433 F.3d 718, 725 (10th Cir.2006) ("We review the district court's refusal to substitute counsel for an abuse of discretion."); *State v. Cabututan*, 861 P.2d 408, 413 (Utah 1993) (same for motion for a continuance); *State v. Pursifell*, 746 P.2d 270, 273 (Utah Ct.App.1987) (same for appointment of different public attorney for indigent defendant). Although the trial court has discretion to evaluate the timeliness of a motion to substitute counsel, it may not exercise "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request." *United States v. Burgos*, 539 F.3d 641, 646 (7th Cir.2008) (internal quotation marks omitted). Under the facts of this case, we are troubled that this is precisely what has occurred.

¶ 54 At the time Barber first moved to dismiss retained counsel and return to the LDA, only twelve months had passed since the indictment. In addition, although the trial had been continued once at the request of the LDA and another time at the request of Barber's private counsel, there is no indication that reappointing the LDA would have put the current trial date in jeopardy. Although the trial court stated, "I do not want to continue the trial date," there is no indication that the trial court even considered whether a continuance would be required if the LDA resumed Barber's defense.[14] Thus, there is nothing in the trial court's analysis that supports a conclusion that reappointing the LDA after a one-month hiatus would have unduly disrupted or delayed the proceedings. In the absence of such interference with the orderly procedure of the court, Barber's "choice of retained counsel must be respected." *Collins*, 920 F.2d at 626. Furthermore, as we have previously discussed in detail, a defendant's concerns about being represented by "coerced, unpaid counsel," *People v. Ortiz*, 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547, 555 (1990), are justified.

¶ 55 Typically, we are reluctant to interfere with the trial court's administration of its calendar. Nevertheless, where the trial court has provided no explanation for the refusal to allow Barber his counsel of choice and the reason is not apparent from the record, we hold that the trial court exceeded its discretion by insisting "upon expeditiousness in the face of a justifiable request." *Burgos*, 539 F.3d at 646.[15] Furthermore, "[w]here the right to be assisted by counsel of one's choice is wrongly decided, ... it is unnecessary to conduct an ineffectiveness or prejudice inquiry...." *Gonzalez–Lopez*, 548 U.S. at 148, 126 S.Ct. 2557. Accordingly, we reverse and remand for a new trial.[16]

and replaced by private counsel on February 13, 2006. Barber filed the motion to return to the LDA on March 18, 2006.

14. Barber did not appeal the denial of the motion for a continuance of the trial date.

15. Even if Barber's motion were untimely, the trial court must allow the dismissal of paid counsel upon a showing of good cause. *See United States v. Panzardi Alvarez*, 816 F.2d 813, 816 (1st Cir.1987); *accord United States v. Brumer*, 528 F.3d 157, 160–61 (2d Cir.2008). In determining whether the defendant has established good cause for a change in counsel, it is important to understand the defendant's reasons for the request. On the face of this record, we know very little about Barber's motivation. The entire inquiry by the trial court is as follows: "The Court: Mr. Barber, do you have anything to say? Mr. Barber: No."

16. In doing so, we acknowledge that the jury found Barber guilty of a serious offense and that retrial will likely be traumatic and costly. However, the United States Supreme Court's decision

## III. The Photographs Are Not Gruesome

¶ 56 Barber next argues that the trial court admitted several photographs that depicted D.A.'s injuries in violation of rule 403 of the Utah Rules of Evidence.[17] *See* Utah R. Evid. 403. The photographs were taken while D.A. was in the hospital, and various tubes and medical devices can be seen. Most of the photographs highlight the bruising D.A. suffered, with some close-up shots of individual bruises and other shots of large portions of D.A.'s body. Moreover, Barber specifically identifies five pictures, which in addition to showing D.A.'s bruising, "show ... D[.A.]'s face, head, and upper body shortly after he underwent surgery." As Barber notes, these pictures show a surgical incision, the staples required to close the incision, a tube exiting from D.A.'s head, a neck collar, tubes and wires, and some dried blood. Barber argues that all of the photographs, and certainly the five photographs depicting D.A. after surgery, were gruesome.

¶ 57 The Utah Supreme Court has articulated a three-part process for reviewing the admissibility of allegedly gruesome photographs.

> First, we determine whether the photograph is relevant. Second, we consider whether the photograph is gruesome. Finally, we apply the appropriate balancing test. If the photograph is gruesome, it should not be admitted unless the State can show that the probative value of the photograph substantially outweighs the risk of unfair prejudice. If the photograph is not gruesome, it should be admitted unless the defendant can show that the risk of unfair prejudice substantially outweighs the probative value of the photograph.

*State v. Gulbransen*, 2005 UT 7, ¶ 34, 106 P.3d 734 (internal quotation marks omitted).

¶ 58 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Barber does not directly argue the photographs were not relevant. Rather, Barber argues that the photographs were unnecessary because the bruising and the fact that D.A. suffered serious bodily injury were not disputed and were established by expert testimony and diagrams. Consequently, Barber contends that the photographs were erroneously admitted into evidence. We disagree.

¶ 59 "[A] stipulation of fact by defense counsel does not make evidence less relevant, nor is it a basis for depriving the prosecution the opportunity of profiting from the legitimate moral force of its evidence in persuading a jury." *Gulbransen*, 2005 UT 7, ¶ 37, 106 P.3d 734 (internal quotation marks omitted); *see also State v. Florez*, 777 P.2d 452, 455 (Utah 1989) ("[S]o long as the defendant maintains his [not] guilty plea, the State [has] the right to prove its case up to the hilt in whatever manner it [chooses], subject only to the rules of evidence and standards of fair play." (internal quotation marks omitted)). Likewise, "the fact that the same evidence could have been provided by purely testimonial means does not necessarily make a photograph inadmissible." *Gulbransen*, 2005 UT 7, ¶ 38, 106 P.3d 734 (internal quotation marks omitted). Accordingly, we agree with the trial court that the evidence was relevant.

¶ 60 When determining whether a photograph is gruesome, we consider a number of factors, "including, but not limited to, whether the photograph is in color ...; whether it is an enlargement or close-up shot; when the photo was taken in relation to the crime; and whether other details in the photo, aside from the victim, 'may exacerbate the photograph's impact on the viewer.'" *Id.* ¶ 39 (quoting *State v. Bluff*, 2002 UT 66, ¶ 43, 52 P.3d 1210). However, "these factors are not exclusive," *Bluff*, 2002 UT 66, ¶ 43, 52 P.3d 1210, nor are they necessarily determinative, *see, e.g., Gulbransen*, 2005 UT 7, ¶ 39, 106 P.3d 734 (determining close-up color photograph of a child victim's injured anus was

in *United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), mandates this result.

**17.** We address this issue despite our conclusions regarding the Sixth Amendment because the issue is likely to recur during retrial. *See State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867.

not gruesome); *State v. Vargas,* 2001 UT 5, ¶¶ 53, 56, 20 P.3d 271 (ruling photographs were not gruesome even though "[e]ach of the first three factors [was] met"). Rather, they are merely some of the factors to be considered when deciding the ultimate question—"whether the photographs have a tendency to unfairly prejudice, inflame, or mislead the jury." *State v. Calliham,* 2002 UT 87, ¶ 39, 57 P.3d 220 (internal quotation marks omitted); *see also Vargas,* 2001 UT 5, ¶ 53, 20 P.3d 271 ("We must consider these factors in light of the rationale behind them."). A review of two cases illustrates the types of pictures that may be "graphic and sobering," *Vargas,* 2001 UT 5, ¶ 56, 20 P.3d 271, or "unpleasant" but "not gruesome," *Bluff,* 2002 UT 66, ¶ 51, 52 P.3d 1210.

¶ 61 In *State v. Vargas,* 2001 UT 5, 20 P.3d 271, the defendant was charged with murdering his wife. *See id.* ¶ 1. Two photographs taken during an autopsy of the victim were admitted at trial. *See id.* ¶ 50. The first photograph "show[ed] the top of [the victim's] head after the hair was shaven off, revealing multiple wounds" and "very little blood." *Id.* The second "show[ed the victim's] fractured skull after the scalp had been pulled back." *Id.* The photographs showed "relatively little blood, although portions of the [victim's] brain [could] be seen along the fracture lines in the skull." *Id.* The photographs "were in color, close-up, slightly enlarged, and depicted the body after it had been moved from the crime scene." *Id.* ¶ 53. Nevertheless, the Utah Supreme Court found the pictures were not gruesome. *See id.* ¶ 56. The court noted that the victim's wounds "had been washed and there was relatively little blood," *id.* ¶ 54, and that there were no other details that might inflame the jury, *see id.* ¶ 55. Rather, the photographs merely displayed "the types of injuries [the victim] received" and therefore were admissible. *Id.* ¶ 56.

¶ 62 In *State v. Bluff,* 2002 UT 66, 52 P.3d 1210, the defendant was charged with child abuse and murder. *See id.* ¶ 1. At trial, the State admitted "four color autopsy photographs of [the three-year-old victim]." *Id.* ¶ 13. The photographs showed the victim's extensive bruising, and one showed the victim's head, which had been shaved to expose bruising and lacerations. *See id.* The pictures measured "8x10 inches" and were in color. *See id.* ¶¶ 49–50. The photographs also contained "extraneous objects such as metric cards, gloved hands, towels, a toe tag, [and] an examiner card and case number." *Id.* ¶ 51. Notwithstanding, the supreme court found the pictures were not gruesome. *See id.* It noted that "[w]hile some details in the photographs are unpleasant, they are primarily due to the injuries inflicted on [the victim], not to any foreign object," *id.,* and that the "pictures do not unfairly characterize [the victim's] bruising, her condition, or her injuries," *id.* ¶ 49.

¶ 63 Similar to these two cases, the pictures here include close-up, enlarged, color images. However, the pictures "do not unfairly characterize [D.A.'s] bruising, [his] condition, or [his] injuries," *see id.,* nor do they show unnatural body contortions, with the exception of D.A.'s lips, which are in a slightly unnatural position due to some medical tape on his face, *see id.* ¶ 50. Moreover, the wounds are clean, and there is only a minimal amount of blood in a few of the pictures. *See id.* ¶ 51; *Vargas,* 2001 UT 5, ¶ 54, 20 P.3d 271. Finally, while we acknowledge the presence of tubes, a neck collar, and other similar medical devices, the mere presence of these devices does not render the photographs gruesome. Many of these devices, such as the IV tubes and the electronic wires, are commonly seen on hospital patients and therefore are less likely to inflame a jury. Even the more uncommon medical devices, for example the tube exiting D.A.'s head, are far less shocking or inflammatory than the fact of D.A.'s severe injuries. *See Bluff,* 2002 UT 66, ¶ 51, 52 P.3d 1210 (discounting presence of extraneous objects where the unpleasant nature of the photographs was primarily due to the injuries inflicted).

¶ 64 Thus, after "considering each image as a whole," *see Calliham,* 2002 UT 87, ¶ 39, 57 P.3d 220, we acknowledge that the pictures are "graphic and sobering," *see Vargas,* 2001 UT 5, ¶ 56, 20 P.3d 271, but hold that they are not gruesome. Nevertheless, many of the pictures could have been cropped to

eliminate the tubes coming from D.A.'s head or other disturbing wires or devices, without impacting the relevant evidence. Consequently, we clarify that nothing in this decision is intended to limit the trial court's discretion on remand to require that the pictures be cropped to achieve the proper balance under the traditional framework of rule 403, if the trial court concludes that such modifications are appropriate. *See* Utah R. Evid. 403.

## CONCLUSION

¶ 65 Although Barber's trial counsel was ineffective in failing to investigate or offer a medical expert, under the facts of this case, the deficiency was not prejudicial. The trial court erred when it denied Barber's timely request to dismiss retained counsel and that error warrants a new trial without a showing of prejudice. The challenged photographs are disturbing but not gruesome. This case is reversed and remanded for a new trial.

¶ 66 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and JUDITH M. BILLINGS, Senior Judge.